**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**MARY CARTER**                                                                    **PLAINTIFF**

**V.**                                                      **CIVIL ACTION NO.:** 3:22-cv-712-KHJ-MTP

**CITY OF JACKSON, MISSISSIPPI**                                          **DEFENDANT**

**COMPLAINT**
**JURY TRIAL DEMANDED**

      **COMES NOW** the Plaintiff, Mary Carter, by and through her counsel, Watson &

Norris, PLLC, and files this action against Defendant, the City of Jackson, Mississippi, for

violation of her rights under the First Amendment to the United States Constitution which

constitutes unlawful retaliation.    In support of this cause, the Plaintiff would show unto

the Court the following facts to-wit:

### PARTIES

      1.     Plaintiff, Mary Carter, is a 58 year-old black female resident citizen of Hinds

County, Mississippi.

      2.     Defendant, City of Jackson, Mississippi, may be served with process by

serving the City Clerk, Angela Harris, 219 South President Street, Jackson, Mississippi

39201.

### JURISDICTION AND VENUE

      3.     This Court has federal question jurisdiction and venue is proper in this

Court.

      4.     This action arises under the U.S. Const. Amend. I, 42 U.S.C §1983 and

Mississippi law.

## STATEMENT OF THE FACTS

5.    Plaintiff is a 58-year-old female resident of Hinds County and Jackson, Mississippi.

6.    Plaintiff was hired on November 3, 2013, as the Deputy Director of Water Operations at the City of Jackson.

7.    During July 2015, she was demoted to the position of Wastewater Facilities Manager by the Tony Yarber mayoral administration, yet in July 2018, she was reappointed to the position of Deputy Director of Water Operations by Mayor Chokwe Lumumba.

8.    Plaintiff is also a certified Class A Operator, and she was the Operator of Record for the City of Jackson.

9.    In that role, whenever there were issues that needed to be addressed with the water plants, Plaintiff communicated with the City's administration about those issues.

10.    On March 27, 2020, United Stated Environmental Protection Agency (EPA) Director of Enforcement and Compliance Assurance Division Carol Kemker filed an Emergency Administrative Order against the City of Jackson Public Water System.

11.    The order was sent to City of Jackson Mayor Chokwe A. Lumumba, and it was cc'd to Director of City of Jackson Department of Public Works Robert Miller and Mississippi State Department of Health (MSDH) Director of Office of Environmental Health Lester Herrington.

12.    In brief, the Order indicated that the conditions of the City's water treatment plants were found to be woefully deficient based on specific standards, and the City was ordered to correct the problems.

13.     On July 1, 2021, the EPA enacted an Administrative Compliance Order on Consent (AOC) for the Public Water System in the City of Jackson, a true and correct copy of which is attached as Exhibit "1."

14.     Among the many statements in the AOC, it stated, "Within thirty (30) days of the Effective Date of this AOC, Respondent shall provide the EPA with a Comprehensive Staffing Plan…Respondent's Plan shall identify how it will ensure that a Class A Operator is onsite at all times, including any back up plans in case staff are unavailable." Exhibit "1."

15.     The Mississippi State Regulations have several levels of Water Operator classifications: Class A, B, C, and D.

16.     The classification required depends on the size of the water system.

17.     Since the City of Jackson has over 100,000 customers, the water system is classified as a Class A water system.

18.     The operations of the facility are ongoing 24 hours a day, 7 days a week.

19.     Likewise, State regulations mandate that a licensed Class A Operator must be onsite at the facility 24 hours a day, 7 days a week.

20.     In July 2021, there were only three Class A Operators working at the City of Jackson O.B. Curtis Water Treatment Plant (OBCWTP).

21.     They were Robert Lofton, Holse Nelson, and Plaintiff.

22.     Mr. Lofton worked 7 p.m. to 7 a.m. every day.

23.     From June to December 2021, Plaintiff took one of Mr. Lofton's evening shifts per week to give him a break.

24.     Mr. Nelson worked Monday through Friday 7 a.m. to 7 p.m.

25.     Plaintiff worked Saturdays and Sundays 7 a.m. to 7 p.m.

26.     In July 2021, Marlin King was named the City of Jackson's Public Works Director.

27.     As time went by, Mr. King refused to communicate with the former Public Works Director and others in his circle.

28.     In late August 2021, Chief of the Drinking Water Enforcement Section of the Enforcement & Compliance Assurance Division of the EPA Bryan Myers invited various members of the EPA, the City of Jackson Public Water System, and the MSDH, to participate with a bi-weekly virtual meeting to take place every two weeks.

29.     The first meeting was on September 9, 2021, from 2-3 p.m., and meetings continued every other Thursday at that same time from that point forward.

30.     The attendees of the meeting included, Plaintiff, City Engineer Charles Williams, Mary Jo Bragan, Amanda Driskell, Melissa Hardage, Rebecca Quinones, Robert Burns, Dominique Smith, Brian Smith, Heidi Rausch, Carol King, Director of EPA Enforcement and Compliance Assurance Division Carol Kemker, Larry Lamberth, Karen Walters, Suzanne Armor, Michele Wetherington, Mousetta Spann, Jeffrey Estridge, Charles Shultis, Lenore Holmes, Amy McLeod, Brandi Jenkins, Mita Ghosh, and Shawneille Cambell-Dunbar.  *See* Bryan Myers, EPA Water Compliance Chief - Email Invite with participants, a true and correct copy of which is attached as Exhibit "2."

31.     Other attendees of this meeting included Mr. King, City of Jackson Chief Administrative Officer Louis Wright, City Attorney Catoria Martin, City of Jackson Public Works Attorney Terry Williamson, MSDH Director of the Bureau of Public Water Supply William Moody, and Director of Office of Environmental Health Lester Herrington.

32.    Mr. King participated with these bi-weekly meetings sporadically and was often absent.

33.    When he was present, Mr. King was often observed to be sleeping and not attentive to the issues being addressed. *See* Picture of Marlin King and Robert Lee sleeping on the job, a true and correct copy of which is attached as Exhibit "3."

34.    In mid-December 2021, Class A Operator Vincent Thomas was hired by the City of Jackson to work to 7a.m. – 7 p.m. every day.

35.    At that point, Plaintiff stopped consistently working on Saturdays and Sundays and she discontinued working one night shift per week.

36.    After that, she no longer worked any consistent times, but she continued to fill in as needed if one of the other Class A Operators was sick or needed to be out.

37.    In January 2022, Louis Latson and Roderick Diggs were hired.

38.    Both had previously been Class A Operators but had allowed their licenses to lapse.

39.    More recently, both had taken the Class A Operator test, with the goal getting reactivated.

40.    Neither of them had passed the test, however, and they were both waiting to take the test again.

41.    On April 11, 2022, at 9:22 a.m., Plaintiff sent an email to City of Jackson Finance Administration Representative David Kinsey, requesting an updated Water/Sewer Utilities Division Loader.

42.    Plaintiff was requesting an employee loader with the goal of complying with the EPA's AOC instruction to hire Class A Operators and sufficiently staff the City's Public

Water System.  *See* Email thread where Carter requests employee loader, a true and correct copy of which is attached as *See* Exhibit "4."

43.    Specifically, an employee loader is a spreadsheet that shows all employee positions in a division.

44.    It indicates what positions are filled, unfilled, frozen, or deleted.

45.    It also indicates the rate of pay and the name of the present and past employee who is in a particular position.

46.    On April 11, 2022, at 9:41 a.m., Mr. Kinsey emailed a response to Plaintiff that she would need to "get an updated loader from Marlin King."  Exhibit "4."

47.    On April 11, 2022, at 9:43 a.m., therefore, Plaintiff emailed Mr. King and stated, "Please send me an updated loader for the Water/Sewer Division."

48.    Mr. Kinsey was cc'd on this email.  *See* Exhibit "4."

49.    In the weeks that followed, Mr. King did not respond to Plaintiff's email.

50.    At some point during the following month, Plaintiff asked Mr. King in person to please send her the employee loader, yet Mr. King still did not respond to her request.

51.    Around the beginning of May 2022, City Engineer Charles Williams retired.

52.    Beginning at that time, EPA Chief Myers began expressing concern to those in attendance with the bi-weekly virtual meetings that Mr. King was not adequately participating with the meetings and was needed to ensure that communication was flowing between the EPA and the City's administration.

53.    On May 12, 2022, at 10:52 p.m., Plaintiff emailed Mr. King and stated, "This is my third request for a Water/Sewer Division loader, one by email and one verbally."

54.    Plaintiff cc'd this email to Chief Administrative Officer Louis Wright and Chief

Financial Officer Fidelis Malembeka. *See* Exhibit "4."

55.     On May 13, 2022, Mr. Myers sent an email to all the attendees of the bi-weekly virtual meeting (see above), as well as William Moody, Terry Williamson, Charlotte Bunch, and Mr. King.

56.     This email was addressed to Mr. King and stated, "…since the signing of the 1414 AOC, the City has had a net loss both operators and maintenance staff, and has not shared with the EPA how they plan to bring staffing levels up to normal operations…"

57.     Later in the email, Mr. King is instructed to provide a status update on several items, one of which is, "4.  Plan for how city will ensure that Class A operator is onsite at all times." *See* Tasks Under EPA's AOC, a true and correct copy of which is attached as Exhibit "5."

58.     Later that same day (May 13, 2022), Mr. King emailed a reply to Mr. Myers and cc'd all the same recipients of Mr. Myers' initial email.

59.     In that email, Mr. King stated, "I will meet with Mrs. Carter on the outstanding items and I will provide an update at next week's meeting." *See* Exhibit "5."

60.     On May 16, 2022, Plaintiff met with Mr. King and others during a weekly meeting regarding the outstanding items and a plan was made to send the appropriate information to the EPA.

61.     On May 18, 2022, Plaintiff spoke to Mr. King and explained to him that she had been working both in her administrative role, i.e., Deputy Director of Water Operations, as well as filling in at the OBCWTP as a Class A Operator.

62.     Plaintiff felt that Mr. King was not appreciating the urgency of the situation and seemed not to care about her concerns.

7

63.     Mr. King told Plaintiff to send him "something in writing".

64.     Later that day (May 18, 2022), therefore, at 10:44 p.m., Plaintiff emailed Mr. King, stating, "Per our conversation today, I will no longer be able to fill in at OBCWTP and perform my Deputy Director duties during the day [i.e., she had been filling in a lot as a Class A Operator in the evenings]. Again, I had requested the Water/Sewer Loader so that I could understand and devise a plan to bring on a retired Class A operator part time. It appears that you don't understand the urgency of this situation. If a Class A operator is not on site, we will be in violation of the USEPA Administration Order of Compliance. Never has a [Public Works] Director forbade a Deputy Director from receiving an employee loader. As a reminder, I worked 24 to 36 hours at [O.B. Curtis WTP] every Saturday and Sunday 7a-7p and Wednesday or Thursday night 7p-7a over six (6) months last year because of the Class A operator shortage. At this point, I am just worn down…I don't want us in the news for a Notice of Violation from USEPA for not having a Class A operator on site at all times." This email was cc'd to Mr. Wright and Mr. Malembeka. *See* Exhibit "4."

65.     On May 19, 2022, at 8 a.m., Mr. Wright responded to Plaintiff and cc'd Mr. King and Mr. Malembeka.

66.     In that email, Mr. Wright stated, "Let's all discuss this situation. I will get something scheduled." *See* Exhibit "4."

67.     Despite this statement, however, the situation was never further discussed, and nothing was ever scheduled.

68.     As the biweekly virtual meetings continued between the city, the EPA, and the Mississippi State Department of Health (MSDH), the EPA members showed

increasing concern and frustration that the City of Jackson was moving so slowly toward the goal of hiring more staff.

69.    In mid-June 2022, the OBCWTP experienced an ammonia leak, which caused water treatment to be disrupted for a couple of days.

70.    In the follow up to managing that situation, Plaintiff emailed Mr. King on June 20, 2022.

71.    In that email, she wrote, "During our EPA and MSDH meeting last Thursday. MSDH complained about…EPA also complained that you had missed three (3) of their meetings and that was unacceptable… We need to meet with Water Maintenance Supervisors ASAP to figure out where valves are closed and what major repairs need to be done.  Please let me know how soon this meeting can be scheduled."  City of Jackson Mayor Chokwe Lumumba, City of Jackson Chief of Staff Dr. Safiya Omari, Mr. Wright, Robert Lee, Terry Williamson, and Tony Howard were cc'd on that email.   *See* Ammonia leak email thread, a true and correct copy of which is attached as Exhibit "6."

72.    On June 30, 2022, EPA Director of Enforcement and Compliance Assurance Division Carol Kemker emailed a letter to Mayor Lumumba and President of Jackson City Council Virgi Lindsay, and she cc'd it to Vice President of Jackson City Council Angelique Lee, City of Jackson Chief of Staff Dr. Safiya Omari, Mr. King, and MSDH Director of Health Protection Jim Craig.

73.    This email instructed that the City of Jackson respond to a detailed request for information.

74.     Considering the previous ongoing efforts to ensure the City's water system was improving and moving toward compliance with EPA standards, and further considering how the ammonia leak suggested conditions were not sufficiently improving, the EPA implemented this request for information.  *See* Information Request SDWA, a true and correct copy of which is attached as Exhibit "7."

75.     Within the next few days, Mr. Wright sent out an invitation to Plaintiff and others to attend a virtual meeting to take place a day or two after the invitation was sent.

76.     At that meeting, different parties were assigned different tasks to handle to properly respond to the EPA's request for information.

77.     Mr. King was assigned the task of compiling all the information from the other parties and preparing it to be sent back to the EPA.

78.     Mr. King delegated this task to his Executive Office Coordinator, Chris Baxter.

79.     Mr. Baxter emailed Plaintiff and others to respond back to him with email correspondence and any other information related to the EPA's request for information.

80.     Plaintiff complied with this request.

81.     During this process, it appears that one of one of those who had access to Plaintiff's email correspondence, i.e., Operation Supervisors Terrence Byrd and Vincent Thomas, Maintenance Supervisors James Perry and Richard Harper, Office Coordinators Annette Hill and Roberta Lindsey, and Executive Office Coordinator Chris Baxter, may have forwarded some of Plaintiff's email correspondence to WLBT.

82.     The reporter who interviewed Plaintiff said that he had obtained the emails from a City of Jackson employee, but he would not reveal who the person was.

10

83.     Despite having been assigned the task of compiling all the information to send to the EPA, Mr. King put forth minimal effort to comply with the request.

84.     Subsequently, by around mid-July 2022, City of Jackson Public Works Attorney Terry Williamson took it upon himself to compile the information gathered and he sent it to the EPA.

85.     In July 2022, Class A Operator Holsey Nelson discontinued work as a temporary employee.

86.     This reduced the number of Class A Operators to three and that included Plaintiff.

87.     At that point, Plaintiff continued to fill in as a Class A operator, as needed when Mr. Lofton or Mr. Thomas were sick or needed to be off for some reason.  *See* Email thread includes Carter's reference to her working as an Operator, a true and correct copy of which is attached as Exhibit "8."

88.     Although Plaintiff filled in at times, working shifts as a Class A Operator in addition to her day position as Deputy Director, there were times when no Class A Operator was on duty at the OBCWTP.

89.     On or around August 17, 2022, WLBT contacted Plaintiff.

90.     WLBT notified her that they were in possession of her May 18, 2022 email to Mr. King, Exhibit "4," and they requested an opportunity to interview her about it.

91.     On August 18, 2022, Plaintiff was interviewed by Jackson TV station WLBT.

92.     In that interview, Plaintiff explained (as her emails to Mr. King show) that she had reached out multiple times to Mr. King requesting an employee loader to hire an additional Class A Operator.

93.    During the interview, Plaintiff explained how her emails were repeatedly ignored.

94.    On August 22, 2022, at about 4 p.m., City of Jackson Mayor Chokwe Lumumba called Plaintiff and asked her to come attend a meeting at City Hall regarding contract operations for the water plants.

95.    When Plaintiff arrived in the second-floor conference room of City Hall, Mayor Lumumba was sitting at the head of a long conference table.

96.    Also, in attendance and sitting on the sides of the table were Chief of Staff Dr. Safiya Omari, Chief Financial Officer Fidelis Malembeka, City Attorney Catoria Martin, Mr. King, Acting Finance Director Sharon Thames, Public Works Attorney Terry Williamson, and City Engineer Robert Lee.

97.    Also in attendance were Mayor Lumumba's bodyguards, Hondo Lumumba and Marcus Williams, who were sitting along the wall.

98.    When Plaintiff arrived, Mayor Lumumba told her to come in and have a seat.

99.    The only available seat was at the other end of the table from Mayor Lumumba.

100.    As soon as Plaintiff sat down, Mayor Lumumba looked straight at Plaintiff and stated that before he began the meeting, he wanted to say something.

101.    While continuing to look straight at Plaintiff, Mayor Lumumba stated, "We should not be airing our dirty laundry in public".

102.    By now, everyone realized Mayor Lumumba was looking directly at Plaintiff and they all looked at her too.

103.   Realizing that Mayor Lumumba was speaking to her, Plaintiff responded, "Okay."

104.   On August 29, 2022, the OBCWTP source water had to begin releasing excess water from the lake.

105.   This caused the conventional treatment process at the plant to be unstable.

106.   Operators were forced to shut this part of the plant down, which caused a decrease in production of clean water.

107.   This led to the City of Jackson's water system to fail.

108.   Jackson water towers were depleted, and many Jackson residents had low or no water pressure.

109.   Plaintiff texted Mr. King, Dr. Omari, and Mr. Wright, to notify them of the situation and to warn them that they would be receiving calls about the low water pressure.

110.   Later that day, Plaintiff was with Mr. Thomas at OBCWTP, when Mr. Lee and Jordan Hillman approached them.

111.   Ms. Hillman told Plaintiff that Mr. King was gone.

112.   At that moment, what "gone" meant was not fully explained, but it was obvious he was no longer employed with the city.

113.   Ms. Hillman said that she (Jordan Hillman) had been appointed by Mayor Lumumba as the Interim Public Works Director.

114.   Mayor Lumumba then called Plaintiff by phone and informed her that Governor Tate Reeves had declared a water emergency and MSHD would arrive the next day to set up an Emergency Command Center.

115.    On August 30, 2022, Mayor Lumumba, Dr. Omari, Ms. Hillman and Plaintiff met at OBCWTP at 8 a.m., to welcome the arrival of the Emergency Command Center.

116.    At about 10 a.m., the Emergency Command Center arrived.

117.    Mr. Lee arrived about the same time.

118.    Mississippi Emergency Management Association (MEMA) representatives and MSDH representatives asked Plaintiff where they could set up the Command Center.

119.    Plaintiff stated that the area across the parking lot from the Administration building was a good place, since people would need to use the Administration building's restrooms.

120.    The Emergency Command Center trailer unit was parked in front of the administrative building of OBCWTP.

121.    MSDH Representative Jim Craig was appointed by Governor Reeves and City of Jackson Representative Robert Lee was appointed by Mayor Lumumba.

122.    Mr. Craig and Mr. Lee were appointed as Co-Commanders.

123.    Ms. Hillman was designated by Mayor Lumumba as Mr. Lee's backup.

124.    Also in attendance were other officials from MSHD, as well as from MEMA and the EPA.

125.    After the trailer was set up, MSDH, MEMA, EPA representatives and Ms. Hillman went in the trailer.

126.    Most of the people came out of the trailer about an hour later.

127.    When Ms. Hillman came out, Plaintiff asked her how everything was going to go.

128.    Ms. Hillman responded that there would be a 4 p.m. meeting that day and 8 a.m. and 4 p.m. meetings every day moving forward.

129.    Shortly prior to 4 p.m. that day, Plaintiff waited for the 4 p.m. meeting with the intention of attending.

130.    By 4 p.m., however, no meeting started.

131.    Plaintiff saw Ms. Hillman at 4:30 p.m. and asked about the meeting.

132.    Ms. Hillman responded she did not know if they were going to have it.

133.    Plaintiff then went back to her office in the Administration building to work on other things.

134.    At around 5:30 p.m., Plaintiff again asked Ms. Hillman if there was going to be a meeting and Ms. Hillman said "No."

135.    On August 31, 2022, Plaintiff arrived for the 8 a.m. meeting, but was unable to get in because the trailer was so crowded with people.

136.    After the meeting, Plaintiff met with Ms. Hillman and asked what the meeting had covered.

137.    Ms. Hillman responded that they would continue having meetings at 8 a.m. and 4 p.m. each day.

138.    Plaintiff then told Ms. Hillman that she (Plaintiff) normally sends an email to update the City's Administration.

139.    Ms. Hillman responded that she (Ms. Hillman) would send the email update to Administration.

140.    A couple hours later, Plaintiff noticed she still had not seen the emailed update, so she asked Ms. Hillman about it.

141.   Ms. Hillman responded that she had sent the emailed update.

142.   Plaintiff noted that she was not copied onto the email, and she asked Ms. Hillman to please copy her on the emails moving forward.

143.   Ms. Hillman agreed that she would do that.

144.   Plaintiff noticed that a list of contact numbers was given to MEMA, MSDH, EPA, and City Administration.

145.   The only numbers listed for Water Operations personnel were those of Mr. Lee and Ms. Hillman.

146.   Around late morning, Plaintiff went to the J.H. Fewell Water Treatment Plant, to look at a filter for the Project Engineer.

147.   She then returned to OBCWTP around 2 p.m.

148.   She noticed some people in the Administration building and she asked if she could assist them.

149.   They asked where a good place would be to have the Governor's press conference.

150.   Plaintiff assisted them with this, and the press conference was held around 4 p.m.

151.   Subsequently, the 4 p.m. afternoon meeting was cancelled.

152.   Plaintiff left for the day around 6:00 p.m.

153.   On September 1, 2022, Plaintiff attended the 8 a.m. meeting.

154.   After that, at 9:30 a.m., Plaintiff attended a meeting led by the EPA on how plant improvements could be funded.

155.   After that, Plaintiff attended a 2 p.m. meeting and discussed pulling water samples to test with the goal of lifting the Citywide boil notice.

156.   Plaintiff assisted in this process by directing lab personnel to get with the EPA representatives to show them where to pull the samples.

157.   Also, there was an issue with draining one of the conventional basins.

158.   Plaintiff helped find plans for the basin.

159.   A maintenance group came to work on the pipe leading to the basin and discovered the line was broken.

160.   Ms. Hillman told Plaintiff that the City's Sewer Maintenance crew was going to make the repair.

161.   Plaintiff responded that instead of the City's crew a contractor was needed to perform the repair because it was too deep.

162.   Ms. Hillman disregarded this suggestion and had the City of Jackson crew come out anyway.

163.   The City of Jackson crew began digging but soon realized they did not have the equipment to complete the project.

164.   MEMA Safety personnel eventually shut the City of Jackson crew down because of unsafe working conditions.

165.   On September 3, 2022, Plaintiff went to OBCWTP.

166.   Ms. Hillman told Plaintiff that she was covering for Mr. Lee that day and that Mr. Lee would be there the next day.

167.   On September 5, 2022, at 8 a.m., Plaintiff attended the 8 a.m. meeting.

168.    A MEMA official asked a question about a hose, so Plaintiff stepped out to make a call to see if the specific hose requested was available.

169.    After the meeting ended, Plaintiff heard Ms. Hillman tell Mr. Thomas that he might be needed to work the following weekend.

170.    Plaintiff assured Ms. Hillman that she (Plaintiff) was preparing to cover Mr. Thomas' shifts while he was off the following weekend.

171.    On September 6, 2022, Plaintiff arrived but was busy with other duties and did not attend the 8 a.m. meeting.

172.    Plaintiff attended a 2 p.m. meeting and offered helpful comments at that time.

173.    On September 7, 2022, Plaintiff arrived to work at 8 a.m. as usual.

174.    Around mid-morning, Mr. Thomas told Plaintiff that temporary Class A licenses had been issued to Louis Latson and Roderick Diggs.

175.    This meant that Plaintiff did not need to cover any shifts for the following weekend.

176.    Plaintiff attended the 2 p.m. meeting as usual.

177.    On September 8, Plaintiff arrived early and attended a 7 a.m. meeting, during which she provided helpful responses when they were needed.

178.    After that, Plaintiff worked with some other issues the rest of the day prior to leaving at 5 p.m.

179.    During this first week of September 2022, most of the times that Plaintiff spoke to Ms. Hillman or Mr. Lee was when one of them called her to ask for a vendor's phone number.

180.    On September 9, 2022, at 5:54 a.m., Plaintiff sent an email to Mr. Lee and Ms. Hillman, and she carbon copied the email to Dr. Omari and Mr. Wright.

181.    In that email, Plaintiff complained that she had been excluded from participation with managing the water emergency.   She wrote: "Since this Water Emergency has been going on, I have been on the outside looking in…When I tried to attend the Morning Briefing, I am locked out. You have only asked me questions and not tried to meet with me to update me on objectives or next steps in the emergency process. You direct my employees without my knowledge. Since neither of you know anything about water treatment, I would have assumed that I would have been more involved…As this Emergency operation has progressed, the only information I have received is the Daily Update that the public is privy to. I just happened to hear about a meeting on funding future water plant improvements. It was planned because Terry Williamson showed up for the meeting. Funding Information was sent to you from EPA but I was not included and you didn't bother to forward it to me. I am positive that information has been forwarded to you from the MSDH, EPA, MEMA, FEMA, Corp of Engineers and MS Rural Water and it's Federal Counterpart of which I have not been included… As Deputy Director of Water Operations, I need to be more involved in what is going on and not ignored."  *See* 2022-09-09 Email from Carter to Lee and Hillman, a true and correct copy of which is attached as Exhibit "9."

182.    Around mid-morning that same day (September 9, 2022), Ms. Hillman called Plaintiff and asked to meet with her.

183.    Shortly after 1:30 p.m., Plaintiff met with Ms. Hillman.

184.    Also in attendance was Deputy Director of Finance Benita Wells.

185.    Once they were all seated, Ms. Hillman alleged that during the prior two weeks she had noticed that Plaintiff was not cooperating with the Emergency personnel at the plant, and she had decided it was time to sever ties.

186.    Ms. Hillman gave Plaintiff a termination letter. *See* Termination Letter, a true and correct copy of which is attached as Exhibit "10."

187.    Notably, the letter makes no mention of the allegation that Plaintiff had been in any way uncooperative.

188.    Plaintiff contends that during the time in question, i.e., from August 29 to September 9, 2022, she was fully cooperative with the personnel involved in the emergency water situation.

189.    Plaintiff maintains that even though she was not appointed by the Mayor to function in any specific role with the Emergency Command Center unit, she consistently attended meetings, she worked on important logistical matters related to the situation, and she provided information in good faith and whenever it was asked of her.

190.    Plaintiff further contends that although neither Mr. Lee nor Ms. Hillman were particularly knowledgeable about the City's public water system (and Plaintiff was), they were appointed by Mayor Lumumba to participate in the meetings and Plaintiff was not.

191.    Following the City of Jackson's termination of Plaintiff, Jordan Hillman was demoted and placed in Plaintiff's position as of November 27, 2022.

192.    Plaintiff is a 58 year-old black female.

193.    Plaintiff's replacement, Jordan Hillman, is a 35 year-old white female.

## CAUSE OF ACTION

### COUNT I:  VIOLATION OF FIRST AMENDMENT THROUGH 42 U.S.C §1983 – RETALIATION

194.    Plaintiff re-alleges and incorporates all averments set forth in paragraphs 1 through 193 above as if fully incorporated herein.

195.    As described in detail above, Defendant unlawfully retaliated against Plaintiff by terminating Plaintiff's employment with the Defendant.

196.    Plaintiff has suffered damages as a result of the Defendant's actions.

197.    In addition, the Defendant's actions were done maliciously with the intent to cause Plaintiff injury.

198.    Plaintiff has been harmed as a result of this unlawful retaliation, and the Defendant is liable to Plaintiff for the same.

199.    The acts of the Defendant constitute a willful and intentional violation of the First Amendment and entitle Plaintiff to recovery of damages.

## PRAYER FOR RELIEF

**WHEREFORE PREMISES CONSIDERED**, Plaintiff respectfully prays that upon hearing of this matter by a jury, the Plaintiff be granted the following relief in an amount to be determined by the jury:

1.    Back wages;
2.    Reinstatement or front pay in lieu of reinstatement;
3.    Compensatory damages;
4.    Lost benefits;
5.    Tax gross-up and all make whole relief;
6.    Pre-judgment and post-judgment interest;
7.    Attorney's fees;
8.    Costs and expenses; and
9.    Any other relief to which she may be properly entitled.

THIS the 8th day of December 2022.

Respectfully submitted,

MARY CARTER, PLAINTIFF

By: /s/Louis H. Watson, Jr.
Louis H. Watson, Jr. (MB# 9053)
Nick Norris (MB#101574)
Attorneys for Plaintiff

OF COUNSEL:

WATSON & NORRIS, PLLC
4209 Lakeland Drive # 365
Flowood, Mississippi 39232-9212
Phone: (601) 968-0000
Fax: (601) 968-0010
Email: louis@watsonnorris.com
        nick@watsonnorris.com