UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

MARY CARTER                                                                PLAINTIFF

V.                                               CIVIL ACTION NO. 3:22-CV-712-KHJ-MTP

CITY OF JACKSON, MISSISSIPPI                                               DEFENDANT


ORDER

On the verge of the Jackson water crisis, Plaintiff Mary Carter gave a media interview. Carter—then the City of Jackson's Deputy Director of Water Operations—discussed longstanding staffing issues at the City's primary water facility. She also shared that the City had been violating state and federal law. The City fired Carter weeks later. This First Amendment retaliation suit followed.

Before the Court is the City of Jackson's [28] Motion for Summary Judgment. The Court denies the motion.[1]

I.    Background

State and federal law regulate public water systems. As relevant here, each system requires an "operator"—a certified waterworks official who "directly supervises and is personally responsible for [the system's] daily operation and maintenance." 15 Miss. Admin. Code Pt. 20, Subpt. 72, R. 2.1. State law classifies each public water system as Class A through Class E. *See id.* at R. 2.2. Class A

_____

[1] The Court denies as moot Carter's [35] Motion to Strike.

systems are the most complex, so Class A operators require the highest

qualifications under state law. *See id.*; *id.* at R. 2.3 (listing qualifications).

The City of Jackson has a Class A public water system, which operates 24

hours a day, seven days a week. Admin. Compliance Order [1-1] ¶ 27; Carter Aff.

[33-1] ¶ 8. Both state and federal law require that a "certified class A operator shall

be onsite whenever the treatment plant for a Class A public water system treating

surface water is in operation." 15 Miss. Admin. Code Pt. 20, Subpt. 72, R. 2.2; *see*

*also* 40 C.F.R. § 141.70(c) (providing that system "must be operated by qualified

personnel who meet the requirements specified by the State"). So state and federal

law require a Class A operator to be onsite 24 hours a day, seven days a week.

In July 2021, the U.S. Environmental Protection Agency (EPA) found that

the City had violated that requirement. [1-1] ¶ 27. The City's logbooks and

discussions revealed that the City's public water system was "not always fully

covered by a Class A certified operator." *Id.* The EPA thus found that the City was

in "noncompliance" with the law. *Id.* The City agreed to "provide the EPA with a

Comprehensive Staffing Plan" that "shall identify how [the City] will ensure that a

Class A operator is onsite at all times, including any backup plans in case staff are

unavailable." *Id.* ¶ 39.

But Class A operators remained in short supply. From July to December

2021, there were just three certified Class A operators at the City's main facility—

one of whom was Carter. *See* [33-1] ¶¶ 5, 9, 14. One of those operators worked

through the night, from 7 PM to 7 AM, six days a week. *Id.* ¶ 9. Another worked

weekdays, from 7 AM to 7 PM. *Id.* Carter covered all remaining 12-hour shifts—one night shift and two weekend shifts—on top of her full-time job as the City's Deputy Director of Water Operations. *See id.* ¶¶ 4–5, 9. She juggled those obligations for about six months, until the City finally hired another Class A operator. *See id.* ¶ 14; *see also* Carter Emails [1-4] at 1–2. After that, Carter filled in for Class A operators who were sick or otherwise unavailable. [33-1] ¶ 14.

From April to May 2022, Carter repeatedly asked the Public Works Director, Marlin King, for an employee loader in an effort to "comply[] with the EPA's [Administrative Compliance Order] instruction to hire Class A Operators and sufficiently staff the City's Public Water System." *See id.* ¶¶ 16–19.[2] Carter emailed King; he never responded. *Id.* ¶ 17. She asked King in person; he never responded. *Id.* ¶ 18. She emailed King again; he never responded. *See id.* ¶ 19.

In mid-May, the EPA emailed King. *Id.* ¶ 20; [1-5] at 2–5. The EPA noted that "the City has had a net loss [of] both operators and maintenance staff, and has not shared with the EPA how they plan to bring staffing levels up to normal operations." [1-5] at 4. The EPA directed King to provide a "[p]lan for how [the] City will ensure that [a] Class A operator is onsite at all times." *Id.* King quickly responded: "I will meet with Mrs. Carter on the outstanding items and I will provide an update." *See id.* at 1–2.

---

[2] "[A]n employee loader is a spreadsheet that shows all employee positions in a division. It indicates what positions are filled, unfilled, frozen, or deleted. It also indicates the rate of pay and the name of the present and past employee who is in a particular position." [33-1] ¶ 16.

Carter and King met days later. *See* [33-1] ¶ 22. Carter explained that she had been working full-time and filling in as a Class A operator. *Id.* King requested that she send him "something in writing." *Id.* So Carter emailed him yet again:

> Per our conversation today, I will no longer be able to fill in at O.B. Curtis WTP and perform my Deputy Director duties during the day. Again, I had requested the Water/Sewer Loader so that I could understand and devise a plan to bring on a retired Class A operator part time. It appears that you don't understand the urgency of this situation. If a Class A operator is not on site, we will be in violation of the USEPA Administration Order of Compliance. Never has a PW Director forbade a Deputy Director from receiving an employee loader.
>
> As a reminder, I worked 24 to 36 hours at OBC every Saturday and Sunday 7a-7p and Wednesday or Thursday night 7p-7a over six (6) months last year because of the Class A operator shortage. At this point, I am just worn down. I hope that somehow you understand. I don't want us in the news for a Notice of Violation from USEPA for not having a Class A operator on site at all times.

[1-4] at 1–2; *see also* [33-1] ¶ 23. King never responded. *See* [33-1] ¶ 24.

Over the coming months, the EPA became increasingly concerned that the City "was moving so slowly toward the goal of hiring more staff." *Id.* ¶ 25. In June, the main plant experienced an ammonia leak, disrupting water treatment for days. *Id.* ¶ 26. Carter emailed King, informing him that the EPA "complained that [he] had missed three (3) of their meetings and that was unacceptable." *Id.* Carter copied the Mayor and other senior officials on that email. *See id.*

In July 2022, a Class A operator quit. *Id.* ¶ 34. Once again, the City's main plant had just three operators—including Carter—to cover every second of every day. *See id.* Carter resumed filling in "at times," but "there were times when no Class A Operator was on duty." *Id.*

A reporter at WLBT contacted Carter in August. *Id.* ¶ 35. He had obtained

Carter's emails to King from an anonymous source. *Id.* ¶ 32. The reporter asked for

an opportunity to interview Carter about her emails. *Id.* ¶ 35.

Carter agreed. In Part 1 of a televised interview, Carter said:

> It felt like [King] didn't understand the plight of what we're trying to
> do. And I was just a little frustrated because I wanted to—we had
> gotten a former [Class A] operator to agree to come back and help us
> 'cause he was a really—you know, he really knew the plant. And so it
> didn't look like they were concerned about trying to get somebody here
> to help us out.

Anthony Warren & C.J. LeMaster, *EXCLUSIVE: Emails Reveal Staffing Shortage*

*Threatened to Shut Down Water Treatment Plants*, WLBT, Part 1 at 2:54–3:24

(Aug. 18, 2022, 5:43 PM), https://www.wlbt.com/2022/08/18/exclusive-emails-reveal-

staffing-shortage-threatened-shut-down-water-treatment-plants/.[3] In Part 2 of the

televised interview, WLBT interviewed both King and Carter about the City's

apparent noncompliance with state and federal law:

| Narrator: | 3 On Your Side analyzed timesheets sent to the EPA from just eight weeks ago and found serious gaps at O.B. Curtis, where, for hours at a time, no Class A operator was working. What we were given adds up to six days and nine hours altogether where no Class A operator was there. |
|---|---|
| King: | You were looking at timesheets, correct? Okay, but you still have someone like Mary Carter, who—she's not required to clock in. So a lot of those gaps, she's able to fill in because she has her Class A operator's license as well. . . . That's something that, if [the EPA] asked, we could easily explain—same way I explained it to you. |

---

[3] The City cites this "easily accessible" page and states that those "three sentences
are the entirety of the speech at issue." Supp. Mem. [29] at 5; Reply [37] at 3. But scrolling
down on that same page reveals "Part 2" of the televised interview, in which Carter is
featured again. *See* Warren & LeMaster, *supra.* The text of that same page includes
additional statements from Carter. *See id.*

> Narrator:    Just one problem with that reason: It's not entirely true,
>              according to Mary Carter.
>
> Reporter:    Did you help fill in during any of those times?
>
> Carter:      Uh, maybe not all of those times.

*Id.*, Part 2 at 3:10–4:05. Carter shook her head no while she answered the question.

*See id.* at 4:00–4:05. Carter's media statements continued into the article:

> Carter says that as a deputy director, she should be privy to employee
> loaders and that she already could have had the part-time worker in
> place had she been given the information. "Since [King] has taken over
> as director, he doesn't want the deputies to look at loaders or anything.
> And so it makes it hard to even figure out what's available," she said.
> "Ms. Johnson is supposed to be the training coordinator, but the only
> thing she did was get in contact with personnel, and personnel told her
> [the position] wasn't available."

*Id.* Carter further explained that operators "want to do all they can to make sure

that the city delivers clean drinking water," but they are "worn out by putting in the

extra hours." *Id.*

Four days after the interview, Mayor Chokwe Antar Lumumba called Carter

and asked her to attend a meeting. [33-1] ¶ 37. Carter arrived at a packed meeting,

where she took the last available seat. *See id.* ¶¶ 37–38. According to Carter:

> As soon as I sat down, Mayor Lumumba looked straight at me and
> stated that before he began the meeting, he wanted to say something
> to me. While continuing to look straight at me, Mayor Lumumba
> stated, "We should not be airing our dirty laundry in public." By now,
> everyone realized Mayor Lumumba was looking directly at me and
> they all looked at me too. Realizing that Mayor Lumumba was
> speaking to me, I responded, "Okay."

*Id.* ¶ 38.

The City's water system failed one week later. *See id.* ¶ 39. The City

appointed an Interim Public Works Director, Jordan Hillman, to replace King. *See*

*id.* ¶¶ 40−41. The Governor declared a water emergency and set up an Emergency

Command Center. *Id.* ¶¶ 41−42. During the emergency, Carter says that she was

"fully cooperative," "consistently attended meetings," and "worked on important

logistical matters." *Id.* ¶ 58.

Even so, Carter was frustrated that she had been "excluded from

participation [in] managing the water emergency." *Id.* ¶ 54. On September 9, she

emailed Hillman and the City Engineer:

> Since this Water Emergency has been going on, I have been on the
> outside looking in. . . . When I tried to attend the Morning Briefing, I
> [was] locked out. You have only asked me questions and not tried to
> meet with me to update me on objectives or next steps in the
> emergency process. You direct my employees without my knowledge.
> Since neither of you know anything about water treatment, I would
> have assumed that I would have been more involved. . . . As this
> Emergency operation has progressed, the only information I have
> received is the Daily Update that the public is privy to. . . .
>
> I have been in the dark since this Emergency has begun. As Deputy
> Director of Water Operations, I need to be more involved in what is
> going on and not ignored.

*Id.*; [1-9] at 2.

Hillman fired Carter later that day, after Mayor Lumumba exercised his

"ultimate authority to approve [Hillman's] recommendation." *See* [33-1] ¶¶ 55−56;

Hillman Decl. [37-2] ¶ 5. Hillman said to Carter: "I have seen, kind of, how you've

moved over the past two weeks, personally. And I didn't listen to anything else

anybody else said, but I've seen you not engage with the team out there, and I do

want to part ways." Meeting Recording [31] at 0:44−0:57. Carter responded that she

"kind of figured it was coming" because they had been ignoring her. *Id.* at 1:56−2:03.

King then submitted an official resignation packet, which included a memorandum addressed to anyone "truly seeking answers." *See* Packet [28-1] at 5. In his memorandum, King stated that, in June and July 2022, he had recommended terminating Carter based on her alleged mistreatment of employees. *Id.* at 5–7; *see* [29] at 15. That mistreatment was purportedly "the reason [Public Works was] having staffing challenges." [28-1] at 6. For her part, Carter denies bullying employees or being insubordinate. [33-1] ¶ 60.

In December 2022, Carter filed this First Amendment retaliation case, claiming that the City fired her because she spoke to the media. Compl. [1]. In October 2023, the City moved for summary judgment. [28]. The Court now takes up that motion.[4]

## II.    Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' while a dispute about that fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 824 (5th Cir. 2022) (quotation omitted). "A movant is entitled to a judgment as a matter of law when the nonmoving party has failed to make a sufficient showing on an essential

---

[4] Carter moved to strike several exhibits to the motion for summary judgment. [35]. Because the Court denies the motion for summary judgment, the Court denies as moot the motion to strike.

element of its case with respect to which it has the burden of proof." *Carnegie Techs., LLC v. Triller, Inc.*, 39 F.4th 288, 293 (5th Cir. 2022) (cleaned up).

The Court views all facts and evidence in the light most favorable to the nonmoving party. *United Fire & Cas. Co. v. Hixson Brothers Inc.*, 453 F.3d 283, 285 (5th Cir. 2006). The Court must "refrain from making credibility determinations or weighing the evidence." *Nationwide Mut. Ins. Co. v. Lake Caroline, Inc.*, 515 F.3d 414, 418 (5th Cir. 2008) (quotation omitted).

III.   Analysis

Carter raises a single claim of employment retaliation related to speech. Her claim has five elements: that (1) she suffered an adverse employment action; (2) she spoke as a citizen; (3) she spoke on a matter of public concern; (4) her interest in the speech outweighs the government's interest in the efficient provision of public services; and (5) her speech precipitated the adverse employment action. *Anderson v. Valdez*, 845 F.3d 580, 590 (5th Cir. 2016) (citation omitted).[5] The Court addresses each element in turn.

A.  Adverse Employment Action

Carter suffered an adverse employment action: termination. *Breaux v. City of Garland*, 205 F.3d 150, 157 (5th Cir. 2000). The City correctly concedes that Carter has satisfied the first element. [29] at 8.

_____

[5] Though the parties collapse the second and third elements, the Court addresses them separately. *See Gibson v. Kilpatrick*, 838 F.3d 476, 482 n.1 (5th Cir. 2016).

B.  Speech as a Citizen

Carter spoke to the media as a citizen, not as a public employee.

"Whether a statement is made as an employee or as a citizen is a question of law." *Graziosi v. City of Greenville*, 775 F.3d 731, 736 (5th Cir. 2015). "When a public employee speaks pursuant to her official duties, she does not speak as a citizen and her statements are not entitled to constitutional protection." *Id.* at 737 (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). The inquiry is "a practical one." *Howell v. Town of Ball*, 827 F.3d 515, 523 (5th Cir. 2016) (quoting *Garcetti*, 547 U.S. at 424). When a public employee "takes [her] job concerns to persons outside the work place . . . , then those external communications are ordinarily not made as an employee, but as a citizen." *Gibson v. Kilpatrick*, 773 F.3d 661, 670 (5th Cir. 2014) (quoting *Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008)) (mentioning "the media" as an example of "an outside actor").

The Supreme Court has emphasized that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Lane v. Franks*, 573 U.S. 228, 240 (2014). The "critical question" is whether the speech is "itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.*

The City does not argue that speaking to the media was "itself ordinarily within the scope of [Carter's] duties." *See id.*; *see also* [29] at 11−12, 16−17 (City disputing only whether Carter was speaking on a matter of public concern); [37] at

10

4–7, 10 (same). In fact, the City submits that Carter's interview was a "display of insubordination." [29] at 14; *see also* [33-1] ¶ 38 (Mayor Lumumba telling Carter soon after her interview that she "should not be airing our dirty laundry in public"). As in *Lane* and *Graziosi*, it appears to be "undisputed that making public statements was not ordinarily within the scope of [Carter's] employment." *Graziosi*, 775 F.3d at 737. Based on the summary-judgment record, Carter spoke to the media as a citizen. Carter has satisfied the second element.

### C. Speech on a Matter of Public Concern

Carter spoke to the media on a matter of public concern.

"[W]hether a statement addresses a matter of public concern is a question of law that must be resolved by the court." *Id.* at 736. Speech involves a matter of public concern "when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Lane*, 573 U.S. at 241 (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). The inquiry turns on the "content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48 (1983).

All three elements—content, form, and context—favor Carter.

First, the content concerned matters of public concern. Carter commented on longstanding "staffing shortages" that "threaten[ed] the ability of the [Public Works] Department to perform its duties." *Moore v. City of Kilgore*, 877 F.2d 364,

370 (5th Cir. 1989); *see also Garcetti*, 547 U.S. at 425 ("Exposing governmental inefficiency . . . is a matter of considerable significance."). Carter disclosed that the City was not "concerned about trying to get [a Class A operator]," even though a former operator who "really knew the plant" had agreed to return; that the City "already could have had the part-time [Class A operator] in place" if King had provided an employee loader; and that personnel said that the position "wasn't available," despite the longstanding shortage of Class A operators. Warren & LeMaster, *supra*, Part 1 at 2:54–3:24; *id.* (article text). Carter explained that operators "want to do all they can to make sure that the city delivers clean drinking water," but they are "worn out by putting in the extra hours." *Id.* These comments— about a staffing shortage that threatened the City's ability to deliver clean drinking water—went to a matter of public concern.

What's more, "[p]ublic interest is near its zenith when ensuring that public organizations are being operated in accordance with the law." *Modica v. Taylor*, 465 F.3d 174, 180 (5th Cir. 2006) (quotation omitted). The Fifth Circuit has held time and again that "[s]peech reporting official misconduct, wrongdoing, or malfeasance on the part of public officials involves matters of public concern." *Branton v. City of Dall.*, 272 F.3d 730, 745 (5th Cir. 2001) (collecting cases). WLBT's reporting found "serious gaps" where no Class A operator was onsite—in violation of state law, federal law, and the EPA's Administrative Compliance Order. *See* Warren & LeMaster, *supra*, Part 2 at 3:10 at 3:26. King attempted to explain that Carter filled in "a lot of those gaps," which he could "easily explain" to the EPA. *See id.* at

3:26–3:56. WLBT responded that King's explanation was "not entirely true, according to Mary Carter." *Id.* at 3:56–4:00. Carter then publicly shared that the City had been violating the law. *See id.* at 4:00–4:05. Exposing the City's legal violations was a matter of public concern.

Second, the speech's form indicates that it was of public concern. "The media in this case approached [Carter]," asked for her comments, and published and broadcasted her responses. *Moore*, 877 F.2d at 370; *see also, e.g.*, *Salge v. Edna Indep. Sch. Dist.*, 411 F.3d 178, 189 (5th Cir. 2005) ("[A]n invitation to speak that has issued from the public, particularly from the press, demonstrates the public's interest in the matter and therefore weighs in favor of holding an employee's speech protected."); *Wetherbe v. Tex. Tech Univ. Sys.*, 699 F. App'x 297, 301 (5th Cir. 2017) (similar). The City's briefing highlights that Carter's comments were "extensively covered by the local news media and political blogs." *See* [29] at 2. Given all of this, the form of Carter's speech was "quintessentially public." *Markos v. City of Atlanta*, 364 F.3d 567, 571 (5th Cir. 2004).

And third, context further reflects that Carter's speech was of public concern. "[S]peech made against the backdrop of ongoing commentary and debate in the press involves the public concern." *Kennedy v. Tangipahoa Par. Libr. Bd. of Control*, 224 F.3d 359, 373 (5th Cir. 2000) (collecting cases). The first sentences of the City's briefing underscore that backdrop here: "It is no secret that the City of Jackson's water system has been in a state of disarray for many years. Court proceedings, local and national news coverage have extensively documented the City's struggles."

[29] at 1; *see also* [28-1] at 5 (King: "The current water crisis in Jackson has been at the forefront of news coverage over the past couple of months and rightfully so."). Less than two weeks before the Jackson water crisis, and upon a reporter's request, Carter spoke against the backdrop of extensive public commentary and debate about the City's water system. The context, too, favors Carter.

Despite all of that, the City submits that Carter's speech was "only of public interest because of 'he said/she said' gossip." [37] at 6. Because the interview merely aired out Carter's "own feelings" and "office bickering," the City says, her speech was an unprotected expression of "'personal matters such as personnel and employment disputes.'" *See id.* at 5; [29] at 8, 11–12 (quoting *Marceaux v. Lafayette City-Par. Consol. Gov't*, 614 F. App'x 705, 710 (5th Cir. 2015)).[6] In the City's view, Carter's media interview on the verge of the Jackson water crisis was "akin to tabloid fodder." [37] at 6.

That blinks reality. As discussed, the content-form-context analysis strongly favors Carter. Even if Carter's speech were "mixed," adding "a hint of personal 'employee' considerations" to a matter of public concern does not vitiate First Amendment protections. *Moore*, 877 F.2d at 371–72 (footnote omitted) (declining to hold plaintiff to "herculean standards of purity of thought and speech"). Put another way, even if there were "some private interests" present in Carter's statements, "the content, form, and context of [her interview] demonstrate that her speech was

---

[6] The City says that this unpublished case "addressed a similar issue to the case at bar." [29] at 12; [37] at 6. It did not. *Marceaux* involved "grievances communicated up the chain of command," "internal expressions of concern or complaint about the operation of the police department," and a suit involving "only employment matters." 614 F. App'x at 710.

predominately public." *Modica*, 465 F.3d at 182. In fact, that speech was overwhelmingly—if not exclusively—public.

In view of the entire record, Carter's speech is "fairly considered as relating to [a] matter of political, social, or other concern to the community." *Lane*, 573 U.S. at 241 (quotation omitted). It was a "subject of legitimate news interest." *Id.* (quotation omitted). Carter has satisfied the third element.

      D.  *Pickering* Balancing

Based on the limited summary-judgment record, *Pickering* balancing weighs in Carter's favor.

*Pickering* balancing requires the Court to "determine whether the interest of the employer 'in promoting the efficiency of the public services it performs through its employees' outweighs [Carter's] and the public's interest in the speech." *Moore*, 877 F.2d at 372 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). It is a question of law "for the court to determine the importance of a plaintiff's speech interest, to determine the importance of a governmental interest in efficient operations, and to balance the relative weight of each." *Kinney v. Weaver*, 367 F.3d 337, 363 (5th Cir. 2004). There is no "general standard," given the "enormous variety of fact situations" in First Amendment retaliation claims. *Connick v. Myers*, 461 U.S. 138, 154 (1983) (quoting *Pickering*, 391 U.S. at 569). A "nonexclusive" list of relevant factors includes:

> (1) the degree to which the employee's activity involved a matter of public concern; (2) the time, place, and manner of the employee's activity; (3) whether close working relationships are essential to fulfilling the employee's public responsibilities and the potential effect

of the employee's activity on those relationships; (4) whether the
employee's activity may be characterized as hostile, abusive, or
insubordinate; (5) whether the activity impairs discipline by superiors
or harmony among coworkers.

*Brady v. Fort Bend Cnty.*, 145 F.3d 691, 707 & n.6 (5th Cir. 1998).

"The City bears the burden of producing evidence which shows its interest in
disciplining [Carter] for [her] speech." *Moore*, 877 F.2d at 369. "The strength of the
'city interest' that the City must demonstrate depends on the strength of the 'speech
interest' in the scale's other pan." *Id.*

On one side of the scale, both Carter and the public have an "extremely
significant" interest in the speech. *Id.* at 373; *see also supra*, pp. 11−15. As in
*Moore*, Carter's speech about the "effectiveness of [Public Works] Department
services concerns the people of the City" and "provides the public with valuable
information that is otherwise difficult to obtain unless an informed person speaks
out." 877 F.2d at 372. And Carter herself had a "significant interest in speaking on
this issue[:] Dissemination of information throughout the community may bring the
community's suasion to bear on the issue of the effectiveness of the [Public Works]
Department." *Id.*

Another factor supporting a "particularly weighty First Amendment interest"
here is Carter's disclosure of "official misconduct." *Kinney*, 367 F.3d at 361−62.
Under the First Amendment, it is "essential" that officials, who are "often in the
best position to know about the occurrence of official misconduct," be able to speak
out against it. *Id.* (cleaned up). Carter's speech indicated that the City was violating
state and federal law. That, too, supports a weighty interest in Carter's speech.

16

Turning to the City's side of the scale, the Court finds little in the summary-judgment record. Notably, the relevant issue is "not the weight of [a] governmental interest considered in abstract terms." *Id.* at 362. Rather, courts must assess how the speech actually or potentially "*affects* the government's interest in providing services efficiently." *Id.* That is, courts "do not let the governmental defendant prevail, *on summary judgment*, by relying on interests that, viewing the record in the non-movant's favor, are not reasonably threatened in the case." *Id.* at 363.

Yet the City "did not submit any evidence, or even assert, that [Carter's] statements caused conflict in the department or disruption of its normal operation." *Brawner v. City of Richardson*, 855 F.2d 187, 192 (5th Cir. 1988). The City says only that it "can be argued" that Carter's statements "could" negatively affect the Public Works Department's efficiency. [29] at 15. In support of that carefully couched statement, the City points only to the Mayor's comment about "airing our dirty laundry." *See id.*; [37] at 8. But the fact of the Mayor's disapproval does not reveal its basis. The Mayor's ambiguous remark could have reflected political, rather than operational, concerns. It is unclear that the Public Works Department faced disruption, let alone that the Mayor learned about it and then registered his disapproval of Carter's speech on that basis. At bottom, no evidence in the record reveals whether and how Carter's speech actually or potentially "*affect[ed]* the government's interest in providing services efficiently." *Kinney*, 367 F.3d at 362.[7]

---

[7] Based on the limited summary-judgment record, the Court agrees that any adverse effect on close working relationships was primarily attributable to the anonymous leak, not the fact that Carter "further commented on the already leaked emails." [34] at 21. The record further indicates that "there were no close working relationships within the Jackson

That distinguishes *Graziosi*, which the City argues is "directly applicable." [37] at 7. In *Graziosi*, the City "presented evidence that [the plaintiff's] comments were actually disruptive." 775 F.3d at 741. Not so here. And in *Graziosi*, the City's evidence gave rise to a "reasonable prediction of future disruption" based on the plaintiff's speech. *Id.* ("In light of the buzz around the department and Graziosi's promise of future unrestrained conduct, Greenville based its decision to dismiss Graziosi on a reasonable prediction of future disruption."). Not so here: The City does not even argue that it was justified in terminating Carter to prevent *future* disruption stemming from her speech.

Even if Carter's remarks caused some conflict or disruption, based on the summary-judgment record, "such an interest would be outweighed by the public's interest in the disclosure of misconduct or malfeasance." *Brawner*, 855 F.2d at 192. Exposing the City's unlawful conduct may well have created some workplace tension. But "when weighed against the exposure of [unlawful water-management] practices" threatening the City's water system, that disruption is "a minimal interest." *Frazier v. King*, 873 F.2d 820, 826 (5th Cir. 1989).[8]

---

Water Department to begin with." *Id.* While Carter's speech likely did not help her (lack of) relationship with King, her advocacy for increased staffing likely resonated with her overworked coworkers. *See id.* at 25. Carter's response raised these points, but the City did not respond.

[8] *See also, e.g., Moore*, 877 F.2d at 375 ("[K]eeping in mind that Moore's speech does not hinder the ability of the Fire Department to perform its primary task—fighting fires— we find that the City's burden due to insubordination is minimal."); *Porter v. Califano*, 592 F.2d 770, 773–74 (5th Cir. 1979) ("The First Amendment balancing test can hardly be controlled by a finding that disruption did occur. An employee who accurately exposes rampant corruption in her office no doubt may disrupt and demoralize much of the office. But it would be absurd to hold that the First Amendment generally authorizes corrupt

To be sure, when close working relationships are essential, "a wide degree of deference to the employer's judgment is appropriate." *Connick*, 461 U.S. at 151–52. But deference "has never been complete." *Kinney*, 367 F.3d at 364 (quotation omitted). "Disruption is always possible, but to give deference to unfounded predictions of harm would allow the government arbitrarily to punish speech under the guise of preempting disruption." *Id.*; *see also Connick*, 461 U.S. at 152 (cautioning that "a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern"). Given the City's lack of evidence or argument here, and the significance of Carter's speech, the City fails to carry its burden even with the benefit of deference.

Based on the summary-judgment record, *Pickering* balancing weighs strongly in Carter's favor. The fourth element, too, is satisfied.

E. Causation

There is a genuine dispute of material fact as to causation.

Under the *Mt. Healthy* framework, an employee has the initial burden of establishing that her speech was a "substantial" or "motivating" factor in the adverse employment action. *Click v. Copeland*, 970 F.2d 106, 113 (5th Cir. 1992) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). The burden then shifts to the employer, which must "show, by a preponderance of the evidence, a legitimate reason for which it would have taken the same action against the employee even in the absence of this protected conduct." *Id.* "The

---

officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office.").

19

employee can then refute [that] assertion by showing that the employer's proffered explanation is merely pretextual." *Id.*

The Fifth Circuit has held that "summary disposition of the causation issue in First Amendment retaliation claims is generally inappropriate." *Haverda v. Hays Cnty.*, 723 F.3d 586, 595 (5th Cir. 2013) (citing *Click*, 970 F.2d at 113−14); *see also, e.g., James v. Tex. Collin Cnty.*, 535 F.3d 365, 376 n.10 (5th Cir. 2008) ("[C]ausation is generally a question of fact to be left for the jury."); *Branton*, 272 F.3d at 739 ("It is for a jury to resolve any remaining factual disputes as to [causation]."). Courts have generally decided causation at the summary-judgment stage "only when the employer's reasons have not been controverted." *Haverda*, 723 F.3d at 595−96.

A reasonable jury could conclude that Carter's speech was a "substantial" or "motivating" factor in her termination. To begin, the City acknowledges that shortly after Carter's interview, "the Mayor warned [Carter] to not 'air our dirty laundry in public.'" [29] at 12. That is, the person with "ultimate authority" to fire Carter admonished her for her speech. [37-2] ¶ 5. A reasonable jury could view the Mayor's remark as a "smoldering, if not smoking, gun on the causation issue." *See De La Garza v. Brumby*, No. 6:11-CV-37, 2013 WL 754260, at *5 (S.D. Tex. Feb. 27, 2013).

The chronology of events further supports that conclusion. "Close timing" between speech and an adverse action may itself "provide the causal connection required to make out a prima facie retaliation case." *Benfield v. Magee*, 945 F.3d 333, 337 (5th Cir. 2019) (cleaned up) (noting that "lapse of *up to four months* has been found sufficient"). Carter gave her interview on August 18, 2022; the Mayor

20

chastised her for that interview on August 22; the Mayor exercised his "ultimate authority" to fire Carter on September 9. [33-1] ¶¶ 36–38, 55–56; [37-2] ¶ 5. The three-week "chronology of events" could permit "reasonable jurors to draw an inference of retaliation." *Brady v. Hous. Indep. Sch. Dist.*, 113 F.3d 1419, 1424 (5th Cir. 1997). The "substantial" or "motivating" factor question is thus a jury question.

Next, the City argues that it would have fired Carter "even if she did not speak with the media." [29] at 15. The City offers two buckets of evidence supporting that position:

- King had twice recommended firing Carter based on "disrespectful behavior, failure to work with others[,] and bullying of other employees." [37] at 9; *see also* [37-1] ¶¶ 6–9; [28-1] at 5–7, 34–35; [28-2].

- Hillman wrote in an affidavit that Carter was inattentive during the water emergency. [37-2] ¶¶ 8–9 (alleging that Carter failed to work with the Incident Command Staff and was nonresponsive to Hillman's requests for basic information); *see also* [31] at 0:52–0:55.

But Carter has her own evidence supporting a finding of pretext:

- In her affidavit, Carter denies ever being insubordinate or bullying employees. [33-1] ¶ 60. Based on the emails in the record, a jury could consider King's potential motivation for wanting to fire Carter.[9] And despite

---

[9] Dated June 21, King's draft termination letter offered the following description of Carter's alleged bullying: "*I've* received countless emails *from you* of your tyrant behavior over the last 90 days." [28-1] at 34 (emphases added). Just one day prior, on June 20, Carter had emailed King and copied senior City officials, including the Mayor. [33-1] ¶ 26; [1-6] at 1–2. Carter wrote: "During our EPA and MSDH meeting last Thursday[,] MSDH complained about tank levels in the system and low water pressure in South Jackson. EPA also complained that you had missed three (3) of their meetings and that was unacceptable." *Id.* A reasonable jury could consider whether Carter's June 20 email motivated King's June 21 recommendation to fire her.

Notably, Carter's three emails requesting an employee loader also fell within those "90 days." *See* [28-1] at 34; [33-1] ¶¶ 17, 19, 23. After King did not respond to her first email, Carter copied the City's Chief Administrative Officer and Chief Financial Officer on her second and third emails to King. *See id.* A reasonable jury could likewise consider whether Carter's emails—revealing to other officials that King had repeatedly ignored her requests to bring on an operator—motivated King's recommendation to fire her.

King's allegations, an unidentified person in the "City's Administration" told King twice that "Carter should not be terminated at that time because the City did not have an employee with a Class A Operator's license to replace her." [37-1] ¶ 7; *see also id.* ¶ 8. What's more, Carter's response correctly notes the absence of any evidence that King conveyed his concerns to Mayor Lumumba—the person with "ultimate authority." [34] at 31; [37-2] ¶ 5. The City's reply offers no response. Finally, Hillman disclaimed reliance on King's concerns, saying that she "didn't listen to anything else anybody else said." [31] at 0:49–0:52; *see also* [37-2] ¶ 7 (Hillman stating that she "did not want other[s'] opinions to cloud [her] opinion").

- Carter's affidavit states that she was "fully cooperative with the personnel involved in the emergency water situation," "consistently attended meetings," "worked on important logistical matters," and "provided information in good faith and whenever it was asked of [her]." [33-1] ¶ 58; *see also id.* ¶¶ 42, 44–53. Carter also states that Hillman had consistently "ignored" her and "excluded" her from meetings and emails. *Id.* ¶ 54; *see also* [31] at 1:55–2:02 (Carter stating after Hillman fired her, "I kind of figured it was coming because you already ignored me").

Given the summary-judgment record, "whether the [City's] stated reasons are pretextual is a fact issue reserved for the jury." *Haverda*, 723 F.3d at 596.

Because the fifth and final element presents a jury question, the Court denies the City's Motion for Summary Judgment.

IV.    Conclusion

The Court has considered all arguments. Those not addressed would not have changed the outcome. For the stated reasons, the Court DENIES the City of Jackson's [28] Motion for Summary Judgment. The Court also DENIES as moot Carter's [35] Motion to Strike.

SO ORDERED, this 15th day of December, 2023.

s/ *Kristi H. Johnson*
UNITED STATES DISTRICT JUDGE